IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 05–cv–01888–EWN

NEIKO TABB,

     Plaintiff,

v.

JO ANNE B. BARNHART,
Commissioner of Social Security,

     Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

This is a social-security benefits appeal under 42 U.S.C. § 405(g) (2006).  Plaintiff Neiko Tabb challenges the final decision of the Commissioner of Social Security (the "Commissioner"), denying her application for Social Security Disability Insurance benefits.  Jurisdiction is based on 42 U.S.C. § 405(g) (2006).

## FACTS

### 1.    *Medical Evidence*

Plaintiff was born on October 27, 1964, and was thirty-six at the onset of her alleged disability.  (Admin. R. at 50 [filed Dec. 12, 2005].)  Plaintiff has a tenth grade education, and worked in the vocationally relevant past as a certified nursing aide, cashier, parking lot attendant,

and inventory clerk. (*Id.* at 65–72, 307.) Plaintiff alleges an inability to work starting on September 1, 2001, due to knee and back pain. (*Id.* at 46, 355.)

In addition to showing a history of treatment for pain in her knees, calves, back, and neck, the record reflects that Plaintiff sought routine treatment for minor conditions, such as bronchitis, urinary tract infections, earache, strep throat, abdominal pain, skin rash, and hemorrhoids. (*Id.* at 119–20, 137, 142, 184, 186, 233.) In order to clarify the extensive and thoroughly disorganized record of medical evidence, I arrange my recitation of the evidence of Plaintiff's health by ailment, from oldest to most recent.

### a.      *Knee Pain*

On September 11, 2001, Plaintiff presented to orthopedist James P. Lindberg, M.D. with complaints of persistent pain in her right knee. (*Id.* at 344.) Dr. Lindberg had last seen Plaintiff in 1998, after performing arthroscopy on the same knee. (*Id.*) The doctor opined that physical therapy would not benefit Plaintiff's knee, noting that Plaintiff "got three years of relief out of her last [procedure] and . . . wants to proceed with another one." (*Id.*) Surgery was performed on October 4, 2001, and in an October 15, 2001 follow-up appointment, Dr. Lindberg noted that Plaintiff's knee  was "looking good" and could be "full weight bearing" with proper exercise. (*Id.* at 340–42.)

On November 26, 2001, Plaintiff returned to Dr. Lindberg, complaining of some discomfort in her right knee, which had worsened in cold weather. (*Id.* at 338.) The doctor noted that: (1) a November 14, 2001 ultrasound was normal; and (2) Plaintiff needed to exercise in order to strengthen her weak leg muscles. (*Id.*)

On August 27, 2002, Plaintiff presented at an emergency room complaining of right knee pain. (*Id.* at 101.)  Dr. Julianna Batizy-Morley instructed Plaintiff to rest, ice, and elevate her knee, and referred Plaintiff to an orthopedist. (*Id.*)  Dr. Batizy-Morley indicated that Plaintiff could return to work in three days, but should not bear weight on her right knee for five days. (*Id.* at 103.)

On August 30, 2002, Plaintiff visited her primary care physician Dalrie A. Berg, D.O., and received a referral to an orthopedic doctor for the pain in her right knee. (*Id.* at 118.)  On September 23, 2002, Plaintiff visited orthopedic specialist James P. McElhinney, M.D., who noted that Plaintiff had "marked sensitivity with motion of the patella" and "weak quadriceps bilaterally, especially on the right." (*Id.* at 106.)  An x-ray of the right knee revealed no skeletal abnormalities. (*Id.*)  The doctor diagnosed "[r]ight patellar instability," and discussed with Plaintiff her need for physical therapy to improve muscle strength. (*Id.* at 107.)

On October 24, 2002, Plaintiff returned to Dr. McElhinney, noting that she had not received physical therapy, "[a]pparently [because] the place she went would not accept her Medicaid." (*Id.* at 105.)  On examination, the doctor noted Plaintiff's right knee: (1) showed full extension; (2) "flexion to 135–140" degrees; and (3) some apprehension with motion of the patella. (*Id.*)  Dr. McElhinney went over an exercise regime with Plaintiff, wrote a new prescription for physical therapy, and suggested some locations where she could go for such therapy. (*Id.*)

On January 7, 2003, Plaintiff visited Erick Vanzura, D.O., requesting a disability determination. (*Id.* at 112.) Dr. Vanzura performed a physical examination and diagnosed Plaintiff with "[l]eft [sic] knee medial degeneration," which led him to conclude:

> I do not think she is able to function at work in a standing or walking position. She may be able to have a functional role in sitting and sedentary position. However, the seated position, when she keeps her knee in one position for a prolonged period of time, is going to cause her some trouble as well.

(*Id.* at 113.)

On March 4, 2003, Christine M. Bliven, M.D. examined an X-ray of Plaintiff's right knee for arthritis, finding "[m]ild degenerative changes of the patellofemoral joint." (*Id.* at 199.) On April 7, 2003, Plaintiff had a right knee MRI, which revealed small joint effusion, significant cartilage defect, and a "near complete tear of the anterior cruciate ligament." (*Id.* at 187.)

On May 7, 2003, Plaintiff visited Russell W. Simpson, M.D. concerning her torn ligament. (*Id.* at 181.) Dr. Simpson prescribed physical therapy. (*Id.*)

Follow-up appointment records indicate that Dr. McElhinney performed "a patellar tendon transfer on [Plaintiff's] right knee" in July 2003. (*Id.* at 242.) On August 21, 2003, Plaintiff returned to Dr. McElhinney to follow up on the July 2003 right knee surgery. (*Id.* at 176.) Plaintiff complained of some calf pain. (*Id.*) The doctor attributed the leg pain to nerve root irritation and noted that Plaintiff was to begin physical therapy. (*Id.*)

On March 18, 2004, Plaintiff returned to Dr. McElhinney for another follow-up appointment. (*Id.* at 242.) Plaintiff indicated, and Dr. McElhinney's examination confirmed, that the surgery had relieved pain around Plaintiff's kneecap, but that in recent months she had begun

-4-

to suffer pain in the medial and lateral posterior aspects of the same knee.  (*Id.*)  Dr. McElhinney

recommended that Plaintiff commence physical therapy.  (*Id.*)

On April 19, 2004, Dr. McElhinney noted Plaintiff continued to favor her right leg, but

observed full knee extension and flexion to approximately 145 degrees, no instability, no effusion,

calf and thigh tenderness, and normal motor examination.  (*Id.* at 140.)  He opined Plaintiff had

probable sciatica[1] related to lower back disease, and noted that her knee pain seemed "to be

directly related to how her back [was] feeling."  (*Id.*)

On May 6, 2004, Plaintiff returned to Dr. McElhinney, expressing grave concern about a

popliteal cyst,[2] and also complaining of right knee pain and "a lot of right sciatica."  (*Id.* at 238.)

Examination revealed Plaintiff's knee was unremarkable, no specific tenderness, and no palpable

cyst.  (*Id.*)  Review of an MRI revealed an absence of the popliteal cyst and minor changes in the

knee.  (*Id.*)  Dr. McElhinney suggested that Plaintiff work on strengthening her muscles.  (*Id.*)

---

[1]Sciatica is a "condition characterized by pain, tingling, and other abnormal sensations in the thigh, leg, and foot.  The cause is some kind of involvement of the sciatic nerve which is distributed to the lower limb.  The involvement may be inflammation, pressure, injury, tension, etc."  5–S ATTORNEYS' DICTIONARY OF MEDICINE 1238 (Matthew Bender & Co. 2005) (hereinafter "DICTIONARY OF MEDICINE").

[2]A popliteal cyst is a "cyst in the back of the knee, arising from the joint capsule or the sheaths of the tendons."  4–P DICTIONARY OF MEDICINE 7893, *supra* note 1.

### b.      Back Pain

On May 21, 2002, Plaintiff presented to Dr. Berg for a thyroid check and medicine refill. (*Id.* at 119.)  Plaintiff also stated she had back pain, a right ear ache, and right knee pain.  (*Id.*)  Dr. Berg noted "good mobility of [the] spine."  (*Id.*)

On January 3, 2003, Plaintiff presented in an emergency room, complaining of back pain radiating down her left thigh.  (*Id.* at 108.)  On exam, the doctor noted tenderness in her back and a markedly restricted lumbar range.  (*Id.* at 108–09.)  Plaintiff was able to heel-to-toe walk, had normal sensation, negative straight leg lifting, intact reflexes, and no fluctuance or erythema.  (*Id.*)  The treating doctor diagnosed "[l]eft sciatica secondary to L5–S1 disk disease,"[3] administered a morphine injection, and prescribed pain medications and bed rest.  (*Id.* at 109.)  Upon discharge, Plaintiff's condition was "improved and ambulatory."  (*Id.*)

On January 7, 2003, Plaintiff visited Dr. Vanzura, who diagnosed "new onset of an L5 radiculopathy on the left," and ordered an MRI of Plaintiff's spine.  (*Id.*)  Subsequently, the MRI revealed degenerative disc changes and bony changes with a modest broad based disc bulge at L5–S1, and possible mild encroachment on both S1 nerve roots.  (*Id.* at 115.)

On May 27, 2003, Plaintiff visited Augustine U. Obinnah, M.D., complaining of a sore throat.  (*Id.* at 184.)  The doctor diagnosed strep, but also suggested Plaintiff commence physical therapy for her back pain and see an orthopedist concerning her torn knee ligament.  (*Id.*)

---

[3]The L5 is the fifth lumbar vertebra, which sits atop the first sacral vertebra (S1).  *See* 5–S DICTIONARY OF MEDICINE 5628, *supra* note 1.

On referral from Dr. Simpson, Plaintiff visited neurologist Steven D. Johnson, M.D. for an evaluation of back and right knee pain. (*Id.* at 173.) Dr. Johnson noted Plaintiff: (1) walked favoring her right leg in a "slightly peculiar fashion;" (2) was able to heel-to-toe walk; (3) had mild flexion restriction in her spine due to pain; (4) experienced back pain on straight leg raises bilaterally when sitting and standing; (5) had no clear motor deficit in the lower extremities; (6) demonstrated symmetric reflexes at the knees and ankles; (7) and felt significant low back pain as well as pain in the right leg in a "knee/chair test." (*Id.* at 174.) Dr. Johnson reviewed Plaintiff's MRI scans, but questioned whether further surgery would help Plaintiff's back pain: "I am not certain as to the etiology of her pain. The examination is not completely straightforward. For example, I am not certain how to explain the significant pain in her back and leg with knee/chair testing." (*Id.*) Dr. Johnson suggested that physical therapy might be a viable alternative to surgery. (*Id.* at 174–75.)

On October 6, 2003, Plaintiff presented at an emergency room with back pain. (*Id.* at 125.) The treating doctor diagnosed Plaintiff with chronic back pain, noted that Plaintiff "need[ed] to make lifestyle changes to help [her] pain," and provided pain medications. (*Id.* at 125–27.) A spinal MRI on October 17, 2003 revealed little change from previous MRIs, only demonstrating "slight" degenerative changes in Plaintiff's L5–S1 area. (*Id.* at 169.)

From October to December 2003, Dr. Simpson treated Plaintiff for a variety of complaints, including hemorrhoids, skin rashes, knee pain, and back pain. (*Id.* at 233–36.) On October 30, 2003, Plaintiff received a cortisone injection in her back. (*Id.* at 165–68.) On November 19, 2003, Dr. Simpson prescribed a cane. (*Id.* at 228.)

On December 18, 2003, Plaintiff saw neurologist Thomas C. Ribovich, M.D. on referral by Dr. Simpson.  (*Id.* at 209.)  Plaintiff stated that while scrubbing a bathtub, she experienced sharp pain in her lower right leg, which later switched to her left leg.  (*Id.*)  Plaintiff noted a wide variety of pain and numbness in her back and legs, but also stated that medication and epidural steroid injections "do help" with such pain.  (*Id.*)  Dr. Ribovich performed an extensive physical examination, reviewed Plaintiff's May 2003 MRI, and diagnosed left lumbar radiculopathy.[4]  (*Id.* at 209–10.)  Dr. Ribovich indicated that he would discuss treatment options with Plaintiff after receipt of more recent MRI reports, but noted Plaintiff's preference for "surgical intervention rather than attempting to control the symptoms with additional conservative measures such as therapy."  (*Id.* at 210.)

After a pre-operative evaluation, Dr. Ribovich performed surgery on December 30, 2003 to repair Plaintiff's L5–S1 disk herniation.  (*Id.* at 131–53, 146–48.)  On January 9, 2004, Dr. Ribovich removed Plaintiff's stitches, and noted Plaintiff was doing satisfactorily and was increasingly ambulatory.  (*Id.* at 144.)  In a February 2, 2004 follow-up appointment, Plaintiff reported she still had some discomfort in her left calf and lower back, but that she was "gradually recovering."  (*Id.* at 141.)  Dr. Ribovich gave Plaintiff information concerning therapeutic exercises for her back.  (*Id.*)

---

[4]Radiculopathy is "[a]ny disease or abnormality of a dorsal or ventral (sensory or motor) spinal nerve root from the point where it merges with the spinal cord (or brain stem) to the point where it joins its companion root (a motor or a sensory) to form a spinal nerve."  5–R DICTIONARY OF MEDICINE 218, *supra* note 1.

On March 9, 2004, Plaintiff returned to Dr. Ribovich, stating that she was doing

satisfactorily.  (*Id.* at 267.)  Plaintiff did have some stiffness in the morning, for which the doctor

recommended stretching exercises.  (*Id.*)  Dr. Ribovich noted:

> [Plaintiff] states that she is planning on filing for disability rather than seeking
> employment any time in the near future, although I feel that if a more sedentary
> type job can be found she should be able to tolerate this in a month or two.

(*Id.*)

On April 13, 2004, Plaintiff returned to Dr. Ribovich for a follow-up appointment.  (*Id.* at

241.)  Dr. Ribovich noted Plaintiff walked favoring her right leg due to knee pain.  (*Id.* at 241.)

In light of Plaintiff's knee pain and the possibility that Plaintiff would have hemorrhoid surgery in

the near future, Dr. Ribovich withheld recommendations concerning Plaintiff's complaints of

occasional stiffness in her lower back.  (*Id.*)

On May 17, 2004, Plaintiff returned to Dr. Ribovich, stating that surgery had resolved the

pain on her left side, but that symptoms on her right side had since become progressively more

severe.  (*Id.* at 239.)  Dr. Ribovich recommended an MRI.  (*Id.*)

On June 22, 2004, Dr. Ribovich reviewed Plaintiff's most recent MRI, which revealed

"postoperative changes at the L5–S1 level but no evidence of recurrent disc or other abnormality

to explain [Plaintiff's] continued symptoms."  (*Id.*  at 264.)  Dr. Ribovich discussed physical

therapy and steroid injections with Plaintiff, and Plaintiff was agreeable to trying steroid

injections, which Plaintiff subsequently reported to have had little effect.  (*Id.* at 264, 277.)

### c.      *Rheumatic Disease*

Dr. Simpson referred Plaintiff to a specialist in rheumatic diseases, Kenneth Glassman, M.D.  (*Id.* at 179.)  Plaintiff complained of her "bones hurting all the time and [inability] to stand when in pain."  (*Id.*)  Dr. Glassman's assessment revealed no inflammation and full range of motion throughout Plaintiff's spine and extremities.  (*Id.*)  Foot x-rays were unremarkable, while knee x-rays revealed mild degenerative joint disease.  (*Id.*)  Dr. Glassman stated he could not diagnose rheumatoid arthritis.  (*Id.*)

### d.      *Neck Pain*

On September 30, 2003, Plaintiff returned to Dr. Simpson, complaining of pain in her neck.  (*Id.* at 237.)  Dr. Simpson ordered spine images, which revealed a degenerative change in the C5–6 disk in Plaintiff's neck.  (*Id.* at 172.)

On June 23, 2004, Plaintiff had another MRI, apparently in response to complaints of neck pain and tingling in her left arm.  (*Id.* at 261.)  The MRI revealed degenerative changes at C5–6 with a "disc protrusion contacting and deforming the cord."  (*Id.*)

On October 25, 2004, Dr. Ribovich examined Plaintiff for neck and upper left extremity symptoms.  (*Id.* at 262.)  Plaintiff reported that pain in her neck and left arm arose only in recent months.  (*Id.*)  On examination the doctor noted: (1) normal ambulation; (2) neck tenderness to palpitation; (3) no paracervical muscle spasm or tenderness; (4) no tenderness to palpation in the trapezius muscle or along either scapula; (5) slightly limited range of motion in neck; (6) increased symptoms in her left arm upon flexion, extension, and rotation; (7) unremarkable range of motion in both shoulders; (8) normal strength in both extremities; (9) some decreased sensation in both

extremities; (10) and symmetric reflexes.  (*Id.* at 262–63.)  Review of Plaintiff's June 2004

cervical MRI revealed a "left paracentral disc herniation at the C5–6 level."  (*Id.* at 263.)  Plaintiff

declined more conservative treatment in favor of surgery, which Dr. Ribovich proceeded to

schedule.  (*Id.*)  The operation took place on November 12, 2004.  (*Id.* at 277.)

### e.    Depression

On May 26, 2004, Plaintiff saw Dr. Simpson to complain of depression caused in part by

her inability to "do activities she used to do because of pain in her legs."  (*Id.* at 230.)  Dr.

Simpson prescribed Lexapro,[5] and asked Plaintiff to return in three weeks.  (*Id.*)

### f.    Consultative Psychological Exam

Pursuant to the Administrative Law Judge's ("ALJ") order, Brett Vallette, Ph.D.

conducted a consultative psychological examination of Plaintiff on July 28, 2004.  (*Id.* at 243–47,

353.)  When Dr. Vallette inquired into Plaintiff's daily activities, Plaintiff became "extremely

vague," asserting: (1) she does nothing all day long; (2) she does no chores, cooking, or shopping;

(3) she does dress and bathe herself; (4) she does nothing for fun; (5) she has no friends because

of her depression; (6) her four children, with whom she lives, do all household chores; (7) she can

handle money and bills; and (8) she has a driver's license, but cannot drive because of her pain.

(*Id.* at 243–44.)  Plaintiff asserted that her pain was an eight or nine on a scale of one to ten.  (*Id.*

_____

[5]Lexapro is "the trademark name of a selective serotonin reuptake inhibitor that is used as an antidepressant."  3–L DICTIONARY OF MEDICINE 5063, *supra* note 1.

at 244.)  Plaintiff stated she was on Lexapro, Bextra, and norethindrone,[6] and that the medications were helpful.  (*Id.*)  Dr. Vallette noted Plaintiff was "extremely vague and evasive.  I have trouble getting any type of examples out of her or any specific information.  She does appear to be in some pain though . . . , but she does not appear to be in a pain level of [eight] or [nine]."  (*Id.*) Plaintiff asserted her depression caused her to stay in bed for full months at a time, but that her medication made her feel calm and less depressed.  (*Id.*)  On further questioning, Plaintiff admitted "maybe it's only two days in a week I'm in bed."  (*Id.*)  Dr. Vallette opined Plaintiff's score on the Minnesota Multiphasic Personality Inventory ("MMPI")[7] was "right on the edge of some exaggeration of symptoms."  (*Id.*)

The doctor concluded:

> I deferred Axis V because the client was so vague with what she does all day and her symptoms and then saying she is in bed for a month at a time and then changing it to two times a week, so I really do not have a clear picture from the MMPI.  We are seeing a lot of psychological factors that may contribute to pain complaints.  I find it difficult to believe that she cannot do any household chores or shopping or cooking, but then she can dress and bathe herself.  She was extremely vague on past hobbies or interests, vague on the Mental Status part of the evaluation.

---

[6]Bextra is the "trademark name of a cox-2 inhibitor used for pain relief."  1–B DICTIONARY OF MEDICINE 1879, *supra* note 1.  Norethindrone is "orally effective hormone having the properties of progesterone. It is used to control abnormal uterine bleeding, to delay menstruation, and as a contraceptive."  4–N DICTIONARY OF MEDICINE 3266, *supra* note 1.

[7]The MMPI is a psychological test designed to give a general idea of a person's psychological make-up, in which the examinee responds with a true or false answer to a series of over five hundred statements.  *Grubbs v. Bradley*, 552 F. Supp. 1052, 1061 (D.C. Tenn. 1982); *West v. Martin*, 713 P.2d 957, 960 (Kan. Ct. App. 1986).

(*Id.* at 245.)  Dr. Vallette opined Plaintiff's abilities to remember and carry out instructions and to respond appropriately to supervisors, co-workers, and work pressures were not affected by any mental impairment, again noting the "vague" and "conflicting" information he obtained from Plaintiff during the evaluation.  (*Id.* at 246–47.)

**2.      *Procedural History***

Plaintiff applied for disability insurance benefits on October 4, 2002, and was denied benefits on March 7, 2003.  (*Id.* at 25–29, 45–48.)  The ALJ held a hearing on Plaintiff's claim on May 26, 2004, at which Plaintiff and a vocational expert ("VE") testified.  (*Id.* at 350–68.)

Plaintiff testified that she had five children, ranging in age from fifteen to twenty-three, and that the four youngest lived with her.  (*Id.* at 355.)  Plaintiff stated that prior to a recent hemorrhoid surgery, she could stand for ten to fifteen minutes, sit for twenty to twenty-five minutes, walk less than half a block, lift nothing heavier than a plate, and that she spent most of each day recumbent.  (*Id.* at 358–59, 361.)  Plaintiff asserted that her December 2003 surgery had done nothing for her pain, and that she felt constant stabbing pain starting in her back and running through her right leg, numbness in her left foot, and constant stabbing pain in both of her knees. (*Id.* at 360–61.)

The VE, Anthony Manuele, testified that Plaintiff's past relevant work, as per the Dictionary of Occupational Titles, was as follows: (1) certified nursing assistant was medium and heavy as performed with a specific vocational preparation ("SVP")[8] of four; (2) cashier was light,

---

[8]SVP is "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-

unskilled, with an SVP of two; (3) lot attendant was light, semiskilled with an SVP of three; and (4) inventory clerk was medium and semiskilled with an SVP of four.  (*Id.* at 365–66.)

The ALJ posed a hypothetical to the VE, asking whether a person with Plaintiff's education and work history and the following residual functional capacity ("RFC") could perform work previously performed by Plaintiff:

> lift [twenty] pounds occasionally and [ten] pounds frequently; stand and walk for six [sic] hours and sit for six [sic] hours; limited to occasional climbing, no rope, ladders or scaffold; occasional stooping, kneeling, crouching, and crawling.  This person needs to avoid concentrated exposure to extreme cold and to wetness.

(*Id.* at 366.)  The VE testified that such a person would be able to perform the cashier job Plaintiff previously performed.  (*Id.* at 367.)  The ALJ posed a second hypothetical: "lift only [ten] pounds occasionally and less than [ten] pounds frequently; standing and walking for two hours and sitting for six hours; and we'll limit this person to simple instructions."  (*Id.*)  The VE responded that such a person could perform Plaintiff's past work as a gas station cashier, since the job had a "sit/stand type of option."  (*Id.*)

Finally, Plaintiff's counsel posed a third hypothetical, which simply added the following condition to the ALJ's second hypothetical: the need to lie down for fifteen to thirty minutes every two hours.  (*Id.*)  The VE responded that such an additional restriction would preclude a person from substantial gainful activity.  (*Id.*)

---

worker situation."  *Dikeman v. Halter*, 245 F.3d 1182, 1186 n.2 (10th Cir. 2001) (citation and internal quotation marks omitted).

The ALJ noted the record would remain open for thirty days for additional medical evidence, including the results of an MRI ordered by Dr. Ribovich and the consultative psychological examination subsequently performed by Dr. Vallette.  (*Id.* at 353, 364, 368.) Indeed, it appears that the ALJ kept the record open for approximately seven more months, since the most recent medical records contained therein are dated November 2004.

On December 29, 2004, the ALJ issued a decision.  (*Id.* at 15–23.)  The ALJ determined Plaintiff was not disabled because she retained the RFC to perform the full range of sedentary work.  (*Id.* at 22.)  The ALJ added that such work exists in significant numbers in the national economy.  (*Id.*)

In reaching her conclusion, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since the onset of her alleged disability.  (*Id.* at 16.)  Next, the ALJ determined Plaintiff had degenerative disc disease and right knee medial degeneration, both of which were "severe" impairments.  (*Id.*)  Third, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of an impairment in any of the established listings.  (*Id.*)  Then the ALJ determined Plaintiff's RFC.  (*Id.* at 16–22.)  In determining Plaintiff's RFC, the ALJ found that the alleged severity of Plaintiff's pain and limitations was unpersuasive.  (*Id.* at 20.)  In making this determination the ALJ noted, *inter alia*, that: (1) an examining physician had opined Plaintiff to be capable of sedentary work; (2) although Plaintiff complained of worsening right knee impairment in March 2003, she experience improvement from a July 2003 right knee surgery, after which her complaints decreased and clinical exams and MRIs were normal; (3) exams had shown relatively minimal abnormalities,

leading physicians to comment that the etiology of her symptoms was unclear because it was not

corroborated by objective exam findings; (4) Plaintiff often reported improvement of back and leg

pain with medication; (5) an examining physician noted that Plaintiff would be able to perform

sedentary work within two months in March 2004; (6) the record contained few complaints about

neck pain until October 2004; (7) in a consultative exam, Plaintiff reported she quit work in 2001

due to back and knee pain, but her medical record does not reflect that her back pain started until

January 2003; and (8) Plaintiff was evasive during the consultative psychological examination.

(*Id.* at 20–21.)  After considering the medical evidence, the ALJ determined Plaintiff could:

> stand and walk for one to two hours total each in an eight-hour day; sit for
> six to eight hours in an eight-hour day; lift/carry [ten] pounds occasionally
> and less than [ten] pounds frequently; push/pull [ten] pounds occasionally and
> less than [ten] pounds frequently; occasionally climb, but no rope, ladder, or
> scaffold; occasionally stoop, kneel, crouch and crawl; and avoid
> concentrated exposure to extreme cold and wetness.

(*Id.* at 21.)  The ALJ thus found that Plaintiff's RFC precluded her from performing her past

relevant work.  (*Id.*)  The ALJ then proceeded to step five, where she considered Medical-

Vocational Rule 201.25, finding that sedentary jobs Plaintiff could perform existed in significant

numbers in the national economy, and that Plaintiff was not disabled within the meaning of the

Act.  (*Id.*)

Plaintiff appealed this decision, and on August 25, 2005, the Appeals Counsel declined to

review the ALJ's determination.  (*Id.* at 5–8.)  Thus, the ALJ's decision became the

Commissioner's final decision for the purposes of the present appeal.

Plaintiff filed her complaint in this court on August 29, 2005, challenging the Commissioner's denial of disability benefits.  (Compl. [filed Aug. 29, 2005].)  On December 5, 2005, the Commissioner filed her answer.  (Answer [filed Dec. 25, 2005].)  On January 20, 2005, Plaintiff filed her opening brief.  (Pl.'s Opening Br. [filed Jan. 20, 2005] [hereinafter "Pl.'s Br."].)  On March 2, 2005, the Commissioner filed her response. (Def.'s Resp. Br. [filed Mar. 2, 2005] [hereinafter "Def.'s Resp."].)  On April 4, 2005, Plaintiff filed her reply.  (Pl.'s Reply Br. [filed Apr. 4, 2005] [hereinafter "Pl.'s Reply"].)

## ANALYSIS

### 1.      *Standard of Review*

Section 405(g) of the Social Security Act establishes the scope of this court's review of the Commissioner's denial of disability insurance benefits.  *See* 42 U.S.C. § 1383(c)(3) (2006) (incorporating review provisions of 42 U.S.C. § 405[g]).  Section 405(g) provides, in relevant part, that

> [t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner of Social Security or a decision is rendered under subsection (b) of this section which is adverse to an individual who was a party to the hearing before the Commissioner of Social Security, because of failure of the claimant or such individual to submit proof in conformity with any regulation prescribed under subsection (a) of this section, the court shall review only the question of conformity with such regulations and the validity of such regulations.

42 U.S.C. § 405(g) (2006).  Thus, this court's review is limited to determining whether the record as a whole contains substantial evidence supporting the Commissioner's decision.  *See id.*; *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992).  The

court must uphold the Commissioner's decision if it is supported by substantial evidence. *See Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987). This court can neither re-weigh the evidence nor substitute its judgment for that of the ALJ. *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir. 1987). That does not mean, however, that my review is merely cursory. To find that the ALJ's decision is supported by substantial evidence, the record must include sufficient relevant evidence that a reasonable person might deem adequate to support the ultimate conclusion. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987). A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is only a mere scintilla of evidence supporting it. *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). The ALJ's decision is also subject to reversal for application of the wrong legal standard. *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

**2.      *Evaluation of Disability***

The qualifications for disability insurance benefits under the Social Security Act are that the claimant meets the insured status requirements, is less than sixty-five years of age, and is under a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). The Social Security Act defines a disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2006). In proving his disability, a claimant must make a *prima facie* showing that he is unable to return to prior work he has performed. *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988). Once the claimant meets that burden, the

Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs which the claimant could perform. *Frey,* 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability-insurance benefits. *See Bowen v. Yuckert,* 482 U.S. 137, 140–42 (1987) (describing five-step analysis); *accord* 20 C.F.R. § 404.1520 (2006). A claimant may be declared disabled or not disabled at any step; upon such a determination, the subsequent steps may be disregarded. *See Williams v. Bowen,* 844 F.2d 748, 750 (10th Cir. 1988); *accord* 20 C.F.R. § 404.1520(a). First, the claimant must demonstrate that he is not currently involved in any substantial gainful activity. *Id.* § 404.1520(b). Second, the claimant must show a medically severe impairment (or combination of impairments) which limits his physical or mental ability to do basic work activities. *Id.* § 404.1520(c). At the third step, if the impairment matches or is equivalent to established listings, then the claimant is judged conclusively disabled. *Id.* § 404.1520(d). If the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step. At this stage, the claimant must show that the impairment prevents him from performing work he has performed in the past. *See Williams,* 844 F.2d at 751 (citations omitted). If the claimant is able to perform his previous work, he is not disabled. *Id.*; *accord* 20 C.F.R. § 404.1520(e). This step requires a three-phase analysis.

> In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity (RFC), and in the second phase, he must determine the physical and mental demands of the claimant's past relevant work. In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found

in phase two despite the mental and/or physical limitations found in phase one.  At each of these phases, the ALJ must make specific findings.

*Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996) (citations omitted).  The fifth step requires the Commissioner to demonstrate that the claimant has the RFC to perform other work based on the claimant's age, education, past work experience, and there is availability of that type of work in the national economy.  *See Williams*, 844 F.2d at 751; *accord* 20 C.F.R. § 404.1520(f).

**3.     Disability Determination**

Plaintiff alleges that the ALJ erred in a variety of ways.[9]  First,  Plaintiff argues that the ALJ improperly discounted her credibility.  (Pl.'s Br. 18–21.)  Second, Plaintiff alleges the ALJ erred in assessing her RFC, insofar as the ALJ failed to consider either: (1) her neck pain and upper extremity limitations; or (2) the functional effects of her mental impairments.  (*Id.* at 10–17.)  Plaintiff separately argues the ALJ failed to consider the combination of her impairments. (*Id.* at 18.)  Finally, Plaintiff argues that the ALJ erred in relying on the grids.  (*Id.* at 21.)

As discussed below, although I find that the ALJ was justified in discounting Plaintiff's credibility, I also find the ALJ erred by making an RFC determination without sufficient evidence regarding the impact of Plaintiff's neck and upper extremity limitations.  Accordingly, I do not reach the further arguments Plaintiff raises.

---

[9]In the interest of clarity, the court has re-ordered Plaintiff's arguments.

###### a.      Credibility Determination

Plaintiff asserts that the "objective evidence supports [her] allegations, so she should have

been found credible and disabled." (*Id.* at 14.)  Specifically, Plaintiff appears to argue that the

ALJ erred in assessing her credibility by failing (1) to consider several of the *Hargis* factors, or (2)

to question Plaintiff adequately at the administrative hearing.  (*Id.* at 20.)  I note that "[c]redibility

is the province of the ALJ." *Hamilton*, 961 F.2d at 1499.  This court generally treats credibility

determinations made by the ALJ as binding upon review.  *Gossett v. Bowen*, 862 F.2d 802, 807

(10th Cir. 1988).

Plaintiff's allegation that the ALJ erred in failing to consider several of the *Hargis* factors[10]

is unpersuasive, not to mention woefully vague, since Plaintiff neglects to specify which factors

the ALJ failed to consider.  Regardless, "[t]here is not a talismanic requirement that each factor

listed in *Hargis* be addressed," rather the case merely "sets out generally the kinds of factors that

should ordinarily be considered" in assessing the credibility of a plaintiff's allegations of pain.

*Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993).  In the instant case, the ALJ

acknowledged that Plaintiff had severe impairments that could reasonably cause some pain, but

_____

[10]In *Hargis*, the court reiterated "some of the possible factors" an ALJ could weigh in
assessing the credibility of pain testimony:
> the levels of medication and their effectiveness, the extensiveness of the attempts
> (medical or nonmedical) to obtain relief, the frequency of medical contacts, the
> nature of daily activities, subjective measures of credibility that are peculiarly
> within the judgment of the ALJ, the motivation of and relationship between the
> claimant and other witnesses, and the consistency or compatibility of nonmedical
> testimony with objective medical evidence.

*Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991) (quoting *Huston*, 838 F.2d at 1132).

then provided an extensive survey of the evidence which persuaded her that Plaintiff's complaints of "constant pain . . . like someone[] [i]s just stabbing [her] all the time" in her "knees and back" were unpersuasive.  (Admin. R. at 20–21, 360–61.)

To the extent Plaintiff argues that the ALJ's credibility determination was not supported by substantial evidence, I find that Plaintiff is wrong.[11]  Specifically, the ALJ referenced the following evidence, which is well-supported by the record, that lead her to discount Plaintiff's credibility: (1) the assertions of two of Plaintiff's treating doctors that she was capable of performing sedentary work,[12] (*id.* at 20, 113, 267); (2) Plaintiff's statement that her symptoms improved with medication, (*id.* at 20, 209, 244); (3) the fact that Plaintiff's complaints of knee pain decreased after her July 2003 right knee surgery, after which clinical exams and an MRI were normal, (*id.* at 20, 140, 176, 238, 249); (3) examinations relating to her back symptoms revealed minimal abnormalities, leading at least one physician to comment that the etiology of her

---

[11]*Compare* Pl.'s Br. at iii (table of contents suggesting a credibility argument based on lack of substantial evidence), *with id.* at 18–21 (credibility argument failing to discuss lack of evidentiary support); *see also* Pl.'s Reply at 6 ("The Commissioner built her case on credibility, but excluded alot [sic] of objective evidence.").

[12]Elsewhere, Plaintiff attacks the ALJ's reliance on the report of Dr. Vanzura, from which she asserts the ALJ "pick[ed] and cho[se]" evidence by citing "only the part where [Dr. Vanzura] opined she could do sedentary work," but failed to discuss the doctor's statement "that [Plaintiff] would be disabled by her knee impairment."  (Pl.'s Br. at 16.)  Even assuming that Dr. Vanzura had stated that Plaintiff was disabled by her knee impairment — which the court emphatically notes that he did not — the ultimate determination that Plaintiff was capable of *sedentary* work is not necessarily inconsistent with such a determination.  (*See* Admin. R. at 113); *see also Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994) (stating that treating physician's opinion that claimant is disabled is not dispositive because such an ultimate conclusion is reserved to the Commissioner).

symptoms was unclear and not corroborated by objective findings, (*id.* at 20, 174–75); (4) a

psychological profile, which revealed that Plaintiff had a personality on the borderline of being

consistent with exaggeration of symptoms, (*id.* at 20, 244); and (5) Plaintiff's extreme evasiveness

during her July 2004 consultative psychological examination, (*id.* at 21, 243–47).  I emphasize

that this list is representative rather than exhaustive; the ALJ listed further evidence that weighed

into her credibility determination.  (*See id.* at 20–21.)  Even though the ALJ may not have

considered all of the *Hargis* factors, which is not error, it is overwhelmingly clear that substantial

evidence supported her decision to discount Plaintiff's subjective allegations of disabling pain.

Even if this court might have come to a different conclusion than did the ALJ, it cannot re-weigh

the evidence or substitute its judgment for a well-supported opinion of the ALJ.  *See Heckler*, 835

F.2d at 1316.

　　Plaintiff's contention that the ALJ failed to question her adequately at the hearing is

similarly unavailing.[13]  (*See* Pl.'s Br. at 20.)  Plaintiff asserts that the ALJ neglected to ask her

about her "mental disorders, cervical neck impairments, and surgeries."  (*Id.*)  First, the court fails

to see how questioning concerning Plaintiff's mental disorders might have made her allegations of

pain appear more credible.  Plaintiff fails to offer an explanation to aid the court in this endeavor.

Second, with respect to Plaintiff's neck impairments, the court notes that when the ALJ

---

[13]Plaintiff neglects to explain how further questioning by the ALJ at the hearing bears upon the issue of her credibility.  Presumably, Plaintiff raises this argument because she believes that further questioning would have uncovered evidence that might have lead to a more favorable credibility determination.

questioned Plaintiff regarding her pain,[14] Plaintiff herself did not mention any pain in her neck, but did specifically mention pain in her back and legs, as well as numbness in her left foot. (Admin. R. at 360–61.) Plaintiff's counsel did elicit testimony from Plaintiff concerning her most recent visits to Dr. Ribovich, but Plaintiff only mentioned seeing the doctor for pain running from her back to her legs. (*Id.* at 363–64.) Indeed, although both the ALJ and Plaintiff's counsel questioned Plaintiff concerning her impairments, pain, medications, functional abilities, and past relevant work, Plaintiff failed to mention any neck impairment. (*Id.* at 355–64.) That such an extensive effort — not only by the ALJ but also by Plaintiff's counsel — failed to elicit testimony regarding Plaintiff's neck ailments tends to indicate not that the ALJ erred, but that Plaintiff was not suffering neck problems at the time of the hearing. Fourth, the court fails to see what the ALJ would have gained by specifically questioning Plaintiff regarding her surgeries, since the issue at hand was Plaintiff's capacity to work, not Plaintiff's thoughts concerning the surgeries. Clearly, ALJ's focus on such details as Plaintiff's impairments, pain, medications, functional abilities, and past work was more germane to the issues at hand. (*See id.* at 355–64.) Moreover, even if the ALJ's failure to ask about the surgeries could be said to constitute error, such error would be rendered harmless by the fact that Plaintiff's counsel subsequently elicited such testimony. (*Id.* at 360–61.) Finally, Plaintiff also faults the ALJ for not asking about her depression at the hearing. (Pl.'s Br. at 20.) The transcript of the hearing indicates otherwise:

_____

[14]It appears that Plaintiff submitted medical records concerning her neck pain in July 2004, *after* the May 2004 hearing. (*See id.* at 229 [July 6, 2004 letter from Plaintiff's counsel to ALJ, submitting supplemental medical records], 237 [treatment notes indicating onset of neck pain in September 2003], 350 [transcript of May 20, 2004 hearing].)

> ALJ:        Depression.  Does Dr. Simpson treat you for that?
>
> Plaintiff:  No, he hasn't treated me for it yet because I've been going through my
>             surgeries and medication.

(Admin. R. at 361.)  Moreover, the court finds no reference in the record to Plaintiff's depression

until *after* the May 20, 2004 hearing, so it is unclear why the ALJ even asked Plaintiff about it.

(*See id.* at 237 [May 5, 2004 treatment notes from Dr. Simpson concerning complaints of

depression].)  Regardless, the ALJ held the record open after the hearing so she could send

Plaintiff to a consultative *psychological* examiner, so any failure to question Plaintiff at the

hearing is counteracted by the ALJ's endeavor to develop the record with a consultative

examination.  (*Id.* at 368.)  Thus, to the extent that questioning conducted by the ALJ at the

hearing bears upon the validity of her ultimate credibility determination, I find that the ALJ

adequately questioned Plaintiff.  In light of all of the foregoing, I find that the ALJ did not err in

making her credibility determination.

### b.    *RFC Determination: Neck Pain and Related Symptoms*

Plaintiff argues that the ALJ erred in determining Plaintiff was capable of performing

sedentary work because she failed to consider any of Plaintiff's "upper extremity and neck pain

limitations in the assessment of RFC."  (Pl.'s Br. at 11.)  Plaintiff then cites authority indicating

that sedentary work requires upper extremity use.  (*Id.* [citing Soc. Sec. Ruling 83–10, 1983 WL

31251, at *5 ("Most unskilled sedentary jobs require good use of the hands and fingers for

repetitive hand-finger actions."); Soc. Sec. Ruling 85–15, 1985 WL 56857, at *2 ("Nonexertional

limitations can affect the abilities to reach; to seize, hold, grasp, or turn an object (handle).")].)

Prior to her surgery for "C5–C6 disk herniation in her neck," Plaintiff complained of "lost sensation in her left hand and arm," which had progressively worsened, as well as "pressure in her head" and "increasing neck pain along with a headache." (Admin. R. at 282.) On exam just three weeks before surgery, Dr. Ribovich noted: (1) tenderness in the neck to palpation, (2) no paracervical muscle spasm or tenderness, (3) no tenderness to palpation in the trapezius or either scapula, (4) slightly limited range of motion in the neck, (5) unremarkable range of motion in the shoulders, (6) intact strength in both upper extremities, (7) decreased sensation to light touch involving the thumb and index finger of the left hand and lateral left forearm, (8) variably decreased sensation to pin testing involving both the left and right upper extremities in a nonanatomical pattern, and (9) symmetric deep tendon reflexes. (*Id.* at 262–63.) Review of Plaintiff's MRI revealed "disc herniation at the C5–6 level which most likely represents the etiology of [Plaintiff's] current symptoms." (*Id.* at 263.) Although Dr. Ribovich opined in March 2004 that Plaintiff would soon be capable of sedentary work, Dr. Ribovich made no indication either way after the onset of Plaintiff's neck ailment. (*See id.*) Further, the record does not contain medical information that postdates Plaintiff's surgery.[15]

Although I appreciate that the ALJ had substantial reason to doubt the credibility of Plaintiff's subjective complaints of neck and upper extremity symptoms, I cannot endorse the ALJ's determination that "minimal abnormalities were found" in the course of Dr. Ribovich's exam of Plaintiff's neck and left arm ailment. (*Id.* at 20.) Although it may *appear* that Dr.

---

[15]Indeed, the court notes that the administrative record does not contain a functional capacity assessment.

Ribovich's exam did only find minor problems with Plaintiff's neck and shoulder, neither the ALJ

nor this court is equipped with the medical training to make such a determination.  *See generally*

*McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) ("[A]n ALJ may not make

speculative inferences from medical reports.").  Indeed, that Dr. Ribovich saw fit to conduct neck

surgery requiring general anesthesia would appear to indicate that the problem was not, as the

ALJ concluded, the result of a "minimal abnormality."  (*See* Admin. R. at 20, 277–80.)  Further,

while I reiterate that I fully appreciate the ALJ's suspicion that Plaintiff's neck ailment was not

disabling, the ALJ lacked substantial evidence upon which to base an RFC determination that

failed to weigh Plaintiff's decreased sensation and other symptoms that might impact Plaintiff's

ability to reach, handle, or finger.  (*See id.* at 21); *see generally* Soc. Sec. Ruling 85–15, 1985

WL 56857, at *2.

An ALJ is obligated to "make every reasonable effort to ensure that the file contains

sufficient evidence to assess RFC."  Soc. Sec. Ruling 96–8p, 1996 WL 374184 at *5.  When an

ALJ finds no substantial evidence upon which to base an RFC finding, the ALJ should re-contact

the claimant's physicians.  20 C.F.R. §§ 416.912(e), 404.1512(f), 404.1519a(a)(1) (2006); 42

U.S.C. § 423(d)(5)(B) (2006); *see Adkins v. Barnhart*, 80 F. App'x 44, 48 (10th Cir. 2003).  If a

claimant's physicians have additional records that were not provided, the ALJ has the power to

subpoena them, if necessary.  20 C.F.R. §§ 404.950(d)(1), 416.1450(d)(1); *Adkins*, 80 F. App'x

at 48.  If additional records either do not exist or are insufficient to clarify the inconclusive

evidence in the record, then the ALJ should order a consultative examination.  42 U.S.C. §

423(d)(5)(B) (2006); 20 C.F.R. §§ 1512(f), 1519a(a)(1) (2006); *Adkins*, 80 F. App'x at 48.  In

the instant case, when faced with the lack of medical evidence upon which to base her RFC assessment, the ALJ should have contacted Dr. Ribovich. *See White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002) (noting ALJ must recontact a treating physician when the information the physician provides is inadequate to determine whether the claimant is disabled).  The ALJ thus erred by failing to develop the record in assessing Plaintiff's RFC.

**4.**     ***Conclusion***

        Based on the foregoing, it is therefore ORDERED that the Commissioner's decision is AFFIRMED in part, REVERSED in part, and REMANDED for proceedings consistent with this opinion.

        Dated this 9th day of November, 2006.

                                        BY THE COURT:


                                        s/ Edward W. Nottingham
                                        EDWARD W. NOTTINGHAM
                                        United States District Judge